# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

vs.

JAMAL BRANDON SMITH,

Defendant.

Case No. 23-cr-2020-CJW

**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS**

_____

## I.     INTRODUCTION

On March 22, 2023, the Grand Jury returned an Indictment, charging Defendant with one count of Possession with Intent to Distribute a Controlled Substance in violation of 21 U.S.C. Sections 841(a)(1) and (b)(1)(D), one count of Possession of a Firearm During and In Furtherance of a Drug Trafficking Crime in violation of 18 U.S.C. Section 924(c)(1), and one count of Possession of a Machinegun in violation of 18 U.S.C. Sections 922(o) and 924(a)(2).  (Doc. 3.)  The charges arose from a traffic stop for suspected illegal window tinting.  (Doc. 26.)  The deputy sheriff who conducted the stop determined the window tinting to be legal; however, Defendant's actions, statements, and an odor of marijuana prompted a search of Defendant's vehicle.  (*Id.*)  The search resulted in the present charges.  (*Id.*)

The matter before me is Defendant's motion to suppress.  (Doc. 25.)  The motion was filed on May 8, 2023 and contained an inventory of items to be suppressed which includes a P80 9x19mm firearm (including magazine, ammunition, and a switch device), marijuana, cannabis edibles, psilocybin mushrooms, small plastic baggies, a scale, Defendant's cell phone, and any statements made by Defendant after the traffic stop.

1

(Doc. 25 at 1.)  The Government filed a timely resistance to the motion on May 15, 2023.  (Doc. 28.)  The Honorable C.J. Williams, United States District Court Judge, referred the motion to me for a Report and Recommendation.  I held a hearing on Defendant's motion to suppress on June 9, 2023.  (Doc. 29.)

The motion arises from law enforcement's stop and subsequent search of Defendant's person and vehicle.  At the hearing, the following Government exhibits were admitted without objection: Exhibit 1, video from Deputy Tweten's body camera.

At the hearing, the following defense exhibits were admitted without objection:

A.      Iowa DOT window tinting standards;

B.      Deputy Cole Tweten of the Chickasaw County Sheriff's Office's report dated June 20, 2022;

C.      Body camera footage of Deputy Cole Tweten during the traffic stop on June 16, 2022;

D.      Photos of Defendant's red Dodge Charger;

E.      Photos of other vehicles showing window tinting; and

F.      Search warrant for Defendant's iPhone.

The Government called two witnesses: Winneshiek County Sheriff's Deputy Cole Tweten and Bremer County Sheriff's Deputy Chad Walderbach.  Defendant called the Federal Public Defender's Office Investigator Tina Debban.  I found the witnesses to be credible.  For the following reasons, I respectfully recommend that the District Court deny Defendant's Motion to Suppress.

## II.      FINDINGS OF FACT

At approximately 5:40 p.m. on June 16, 2022, Chickasaw County Sheriff's Office Deputy Cole Tweten[1] conducted a routine traffic stop on Highway 218 for what he

---

[1] Cole Tweten is a deputy sheriff with Winneshiek County Sherriff's Office and has worked with both the Chickasaw and Winneshiek County Sheriff's Departments.  (Tweten, Hr'g Test. at 4.)

suspected to be illegally tinted windows on a red Dodge Charger.[2] (Doc. 26.) Deputy Tweten's subsequent report noted that Defendant was also leaning back behind the B pillar[3] of the vehicle, which he believed to be a possible indicator of criminal activity. (*Id.*) Deputy Tweten had about ten to fifteen seconds to view Defendant's window tinting and seat position as the Charger drove past. (Tweten, Hr'g Test. at 19.)[4] As Deputy Tweten drove behind Defendant, he ran the Charger's license plate on his in-car computer and was alerted that the registered vehicle owner had "violent tendencies." (*Id.* at 6.) A "violent tendencies" alert indicates that an individual has previously come into contact with law enforcement in a violent capacity. (*Id.*) After pulling over the Charger, Deputy Tweten initially approached it without his tint reader[5] for safety purposes. (*Id.*) A strong odor of marijuana was coming from the interior of the vehicle. (*Id.*) Defendant provided Deputy Tweten his driver's license and insurance information. (Gov. Exhibit C). Deputy Tweten communicated to Defendant that if the tinting was legal, he would receive a warning. (*Id.*)

---

He had been employed as a sheriff's deputy for approximately ten months at the time of the incident in question. (*Id.*) Deputy Tweten was certified by the Iowa Law Enforcement Academy in August of 2021. Although the testimony was slightly confusing on the year, it seems most likely he completed the academy prior to the incident. (*Id.*)

[2] Deputy Tweten was stationary in the gravel crossover of Highway 218. He was facing west toward the southbound lanes when Defendant drove past in a red Dodge Charger. (Tweten, Hr'g Test. at 5-6.) He was the only deputy on duty at the time of the traffic stop. (*Id.* at 12.)

[3] "The vertical roof support structure located between the front and rear doors on a typical vehicle." https://www.edmunds.com/glossary/b-pillar.html

[4] Citations to hearing testimony are to the Court Reporter's rough draft of the transcript of the June 9, 2023 suppression hearing that was provided as a courtesy to the Court. An official transcript of the hearing had not been entered into the docket at the time this Report and Recommendation was filed.

[5] At the hearing, the terms "tint reader" and "tint meter" were used interchangeably.

Noting the violent tendencies alert and the strong marijuana odor, Deputy Tweten asked the Defendant to join him in his patrol vehicle while he ran his information. (*Id.*) The computer system in the patrol vehicle reported that Defendant had a "no contact" order and was prohibited from owning a firearm. (*Id.*) When asked about the marijuana odor, Defendant denied there were any illegal items in the vehicle. (*Id.*) However, after further questioning, Defendant acknowledged the presence of burnt marijuana. (*Id.*) Deputy Tweten notified Defendant that he would be searching the vehicle and ordered Defendant to remain in the patrol vehicle. Deputy Tweten then assured Defendant that, if there were only burnt marijuana "roaches," then he would throw the burnt marijuana remnants in the grass and let Defendant proceed to work. Defendant became increasingly nervous and admitted there was marijuana in the trunk of his vehicle, but firmly denied possessing a firearm.

Defendant opened the car door and was ordered to stay inside the patrol vehicle. (*Id.*) Defendant disregarded several orders to remain seated and attempted to return to his vehicle on foot. Deputy Tweten took Defendant by the arm and ordered him to return to the patrol vehicle. Defendant freed his arm from Deputy Tweten's grip and began running back to his vehicle. Defendant did not reach his vehicle and was taken to the ground. He was then placed in handcuffs for officer safety. Deputy Tweten's body camera momentarily stopped recording when it was hit during the physical altercation. Defendant was placed in the patrol vehicle for the remainder of the stop and vehicle search.

Deputy Chad Walderbach[6] arrived at the scene as backup while Defendant was handcuffed and seated in the back of Deputy Tweten's patrol vehicle. (Doc. 26.) When

---

[6] Deputy Walderbach was certified by the Iowa Law Enforcement Academy in 2004 and is currently employed by the Bremer County Sheriff's Office. (Walderbach, Hr'g Test. At 38.) He testified it is not unusual for his office to respond to requests for assistance from other agencies. (*Id.* at 39.)

Deputy Walderbach approached the Charger, the driver's side window was partially rolled down and the passenger side window was up. (Walderbach, Hr'g Test. at 42.) He could clearly view the steering wheel and the dashboard through the tint. (*Id.*) Deputy Walderbach then completed a second tint-reading and assisted with the search of the Charger. (*Id.*) He did not have any interaction with Defendant. (Walderbach, Hr'g Test. at 41.) Iowa window tinting standards require that the front windshield and front-side windows have at least 70% light transmittance. Iowa Code Section 321.438(2) (2022); Iowa Admin. Code r. 761-450.7(321), 450.7(2) ("'Excessively dark or reflective' means that the windshield, front side window or front sidewing does not meet a minimum standard of transparency of 70 percent light transmittance.") Deputy Tweten's tint-reading result was 75-76% and Deputy Walderbach's reading was 72-73%.[7] Thus, Defendant's window tint provided sufficient light transmission under Iowa law and he was not issued any traffic citations. (Doc. 26 at 2.)

The deputies' search of the Charger produced the following: a P80 9x19mm firearm, a magazine, ammunition, a switch device, marijuana, cannabis edibles, psilocybin mushrooms, small plastic baggies, and a scale. (*Id.*) Defendant was read and acknowledged his *Miranda* rights when arrested. (Tweten, Hr'g Test. at 15.) Defendant made several unsolicited statements while being transported to jail in the patrol vehicle by Deputy Tweten. Defendant stated that he believed the firearm was legal, but that it was just unregistered. (*Id.*) He declined to participate in an interview at the Chickasaw County Jail. At the jail, $100 and a blue iPhone were seized from Defendant's person.

Law enforcement obtained a warrant and executed a search warrant for the contents of the iPhone on June 20, 2022. (Doc. 26-1.) The phone contained photos and videos of large amounts of marijuana and marijuana usage. (Tweten, Hr'g Test. at 14.)

---

[7] Deputy Tweten stated that he had concerns about the accuracy of the tint reader. (Tweten, Hr'g Test. At 11.)

There was also a series of internet searches related to 3D-printed switches and automatic gun laws in Iowa. (*Id.*) A switch attachment is used to make a firearm shoot automatically. (*Id.*)

Deputy Tweten was questioned about his training in connection with suspected criminal activity. (Tweten, Hr'g Test. at 16.) Approximately one month before the traffic stop, in May of 2022, he attended a course regarding traffic stops and interdiction. (*Id.*) He learned of signs to look for while conducting his normal enforcement that may indicate criminal activity. (*Id.*) In his affidavit in support of the search warrant, he stated that a driver leaning back was a possible indicator of criminal activity. (Doc. 26-1 at 3.)

Deputy Tweten's report states:

My attention was also drawn to this vehicle specifically because as the vehicle passed me, the driver of the vehicle had leaned back behind the B pillar of the vehicle and no driver could be seen as it went by.

(Doc. 26, Def. Ex. B.) Deputy Tweten's affidavit states:

As the vehicle passed me the driver of the vehicle had leaned back behind the B pillar of the vehicle and no driver could be seen as it went by. From my training and experience I knew this among other reactions to the presence of law enforcement to be a possible indicator of criminal activity.

(Doc. 26-1.) These written statements are somewhat confusing about when the driver leaned back, i.e., whether the driver of the Charger was simply driving along in a reclined position or if he was observed by Deputy Tweten moving into a reclined position, perhaps in response to seeing a patrol vehicle.

At the hearing, Deputy Tweten testified that the driver of the Charger had already reclined before the Charger came into the deputy's field of vision. (Tweten, Hr'g Test. at 32.) I find all these statements to be consistent, even if the affidavit and the report might have been drafted more clearly. The fact that the driver was reclined when Deputy Tweten first observed the vehicle does not eliminate the possibility that Defendant saw

the patrol vehicle and reacted to the presence of law enforcement before Deputy Tweten observed him. However, it does eliminate the possibility of Deputy Tweten relying on that reaction as a basis to suspect Defendant. Ultimately, the Government and Deputy Tweten denied Defendant's reclined position formed part of the justification for the stop.

Moreover, as discussed below, even if Deputy Tweten thought something was suspicious about the driver's position, his subjective belief does not matter. He testified that he had seen other drivers seated in this manner (i.e., "that sort of behavior") and then came across other criminal behavior. (*Id.* at 16-17.) He testified that documenting such behavior "is potentially helpful in the investigation as to the items that were found in the vehicle as well." (*Id.* at 17.)

Both deputies testified regarding their limited knowledge of the tint readers used in the field. (Tweten, Hr'g Test. at 11.) At the hearing both Deputy Tweten and Deputy Walderbach stated that they did not need to calibrate the tint readers, nor did they receive any specific or recent training regarding use of such devices. ((*Id.* at 29.); (Walderbach, Hr'g Test. at 43.)) They had been instructed to simply place the device on the glass and wait for the percentage of light transmittance to appear on the digital screen. (*Id.*) Deputy Walderbach did not know the model or manufacturer of the tint-reading devices used in the field. (Walderbach, Hr'g Test, at 43.) Both deputies were also unaware of any maintenance or calibration recommended by the manufacturer. ((Tweten, Hr'g Test. at 29.); (Walderbach, Hr'g Test, at 44.))

At the hearing, an investigator with the Federal Public Defender's Office for the Northern and Southern Districts of Iowa, Tina Debban[8], testified regarding photographs of Defendant's Charger and other unrelated vehicles to depict their window tinting. (Debban, Hr'g Test. at 48.) Ms. Debban regularly reviews discovery files for ongoing

---

[8] Ms. Debban was previously employed by the Cedar Rapids Police Department for 18 years. (Debban, Hr'g Test. at 49.)

cases. (*Id.*) As part of her investigative duties, she photographed Defendant's vehicle and other exemplar vehicles using her phone's standard settings. (*Id.* at 60.) The photographs captured by Ms. Debban are found in Defendant's Exhibits D and E. (*Id.*) Ms. Debban does not have any training or experience regarding window tinting. (*Id.* at 59.)

## III. DISCUSSION

### A. The Parties' Arguments

Defendant argues that the initial traffic stop was unconstitutional because it was made without reasonable suspicion or probable cause. He asserts that the proffered reason for the stop, tinted windows, was merely pretextual. Defendant points to Iowa Code Section 321.438(2), which requires that window tinting not be so dark as to obstruct a view of the vehicle's interior by a person viewing it from outside the vehicle. Defendant alleges photographs of his vehicle demonstrate the visibility of the dashboard and steering wheel from the vehicle's exterior. Exhibit D. Defendant argues that the legality of the window tint is further supported by the lack of a traffic citation. Defendant also argues that a stop based on the reclined position of the driver seat is pretextual. There is no Iowa law that requires a driver's seat to be fully upright. Thus, Defendant argues that the Government lacks probable cause and a reasonable suspicion of criminal activity for the traffic stop.

The Government resists Defendant's Motion to Suppress. The Government asserts that Deputy Tweten's mistake of fact regarding the amount of tinting on the Charger's windows does not require suppression of evidence because it was objectionably reasonable to investigate the windows even where law enforcement had a limited opportunity to observe them. The Government further argues that, even if the traffic stop was unlawful, Defendant's resistance to officers supported a legitimate arrest. The Government argues that the exclusionary rule of the Fourth Amendment does not bar

8

evidence of the new crime. Defendant's attempt to resist arrest and run to his vehicle, the Government asserts, is a new and distinct crime. Thus, the Government argues, the evidence in his vehicle was discovered after the new crime and should therefore not be suppressed. As became clear during arguments at the hearing, the Government denies that leaning back in the vehicle formed any part of the basis for the stop. Rather, the Government contends it was prudent for Deputy Tweten to include that information in his report to show Defendant's proximity to items in the car he is charged with possessing.

At the hearing, Defendant argued that the interference charge based on acts Defendant committed when he left the patrol vehicle does not justify the search or remove the taint of the Fourth Amendment violation. Defendant relies on *Arizona v. Gant*, 556 U.S. 332 (2009) which states that the police are permitted to perform a search of a vehicle incident to arrest when the arrestee is unsecured and within reaching distance of the passenger compartment. Defendant argues *Gant* is inapplicable under the facts of this case.

To this last assertion, the Government responds that the vehicle was relevant to the interference charge because the contents of the vehicle would show Defendant's motive for the interference. (Hr'g Transcript at 67.)

**B.      *Relevant Law***

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The Fourth Amendment prohibits unreasonable searches and seizures by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *United States v. Cortez*, 449 U.S. 411, 417 (1981)); *Terry v. Ohio*, 392 U.S. 1, 9 (1968)) (internal quotations omitted). "A traffic stop constitutes a seizure for purposes of the Fourth Amendment and therefore must be supported by

9

probable cause or reasonable suspicion." *United States v. Givens*, 763 F.3d 987, 989 (8th Cir. 2014) (citing *United States v. Hollins*, 685 F.3d 703, 705-06 (8th Cir. 2012)). Officers may only conduct investigatory stops if they have reasonable suspicion that criminal activity may be afoot. *United States v. Patrick*, 776 F.3d 951, 954 (8th Cir. 2015).

Reasonable suspicion is based on "both the content of the information possessed by police and its degree of reliability." *Navarette v. California*, 572 U.S. 393, 397 (2014) (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)). Reasonable suspicion is based on the totality of the circumstances and requires a "particularized and objective basis" for suspecting legal wrongdoing before a stop can be justified. *United States v. Patrick*, 776 F.3d 951, 954 (8th Cir. 2015) (quoting *Cortez*, 449 U.S. at 417). A hunch does not constitute reasonable suspicion to justify a stop. *Wilson v. Lamp*, 901 F.3d 981, 986 (8th Cir. 2018) (citing *Terry*, 392 U.S. at 27). Rather, officers must be able to articulate "some minimal, objective justification for an investigatory stop." *United States v. Walker*, 555 F.3d 716, 719 (8th Cir. 2009) (quoting *United States v. Fuse*, 391 F.3d 924, 929 (8th Cir. 2004)). However, "[e]ven an officer's incomplete initial observations may give reasonable suspicion for a traffic stop." *Givens*, 763 F.3d at 989 (quoting *Hollins*, 685 F.3d at 706).

*United States v. Harvey* succinctly articulated the concept of reasonable suspicion in the context of a traffic stop:

> The concept of "reasonable suspicion" is not "readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates,* 462 U.S. 213, 232, 103 S. Ct. 2317, 2329 (1983). In large part, common sense dictates the analysis of reasonable suspicion.
>
> > The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behaviors; jurors as

> fact-finders are permitted to do the same and so are law
> enforcement officers.
>
> *United States v. Cortez,* 449 U.S. 411, 418, 101 S. Ct. 690, 695 (1981).
> Inherent in the concept of reasonable suspicion is the fact that officers may
> be mistaken in their beliefs. The keystone in such cases hinges on
> reasonableness. Under the law, "a reasonable but mistaken belief may
> justify an investigative stop." *United States v. Bailey,* 417 F.3d 873, 877
> (8th Cir. 2005). *See also United States v. Garcia–Acuna,* 175 F.3d 1143,
> 1147 (9th Cir. 1999) ("A mistaken premise can furnish grounds for
> a *Terry* stop, if the officers do not know that it is mistaken and are
> reasonable in acting upon it.").

No. 14-00029-11-CR-W-GAF, 2015 WL 1197918, at *4 (W.D. Mo. Mar. 16, 2015).

In the context of traffic violations, a police officer may stop a vehicle only when the officer has "'at least a reasonable, articulable suspicion that criminal activity has occurred or is occurring,' and 'a traffic violation—however minor—creates probable cause to stop the driver of a vehicle.'" *United States v. Cox*, 992 F.3d 706, 709 (8th Cir. 2021) (quoting *United States v. Martin*, 411 F.3d 998, 1000 (8th Cir. 2005)). Generally, a traffic stop "is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996). A minor traffic violation is sufficient to establish probable cause for an officer to conduct a traffic stop even if the stop is pretext for another investigation. *United States v. Sallis*, 507 F.3d 646, 649 (8th Cir. 2007) (quoting *United States v. Coney*, 456 F.3d 850, 855-56 (8th Cir. 2006)). An officer's actual motivation for making the stop beyond simply issuing a traffic violation is irrelevant provided that the officer has an objectively good reason for making the stop. *Id*.

"Mistakes of law or fact, if objectively reasonable, may still justify a valid stop." *United States v. Williams*, 929 F.3d 539, 544 (8th Cir. 2019) (quoting *United States v. Hollins*, 685 F.3d 703, 706 (8th Cir. 2012). "[T]he question is simply whether the

mistake, whether of law or of fact, was an objectively reasonable one." *United States v. Smart*, 393 F.3d 767, 770 (8th Cir. 2005). Such a determination "'is not to be made with the vision of hindsight, but instead by looking to what the officer reasonably knew at the time.'" *Id.* (quoting *United States v. Sanders*, 196 F.3d 910, 913 (8th Cir. 1999)).

## C.   Analysis

### 1.        Whether the stop was lawful

Deputy Tweten had a reasonable, articulable basis to stop the Charger. Iowa Code Section 321.438 provides in pertinent part that:

> 1. A person shall not drive a motor vehicle equipped with a windshield, sidewings, or side or rear windows which do not permit clear vision.
> 2. A person shall not operate on the highway a motor vehicle equipped with a front windshield, as side window to the immediate right or left of the driver, or a sidewing forward of and to the left or right of the driver which is excessively dark or reflective so that it is difficult for a person outside the motor vehicle to see into the motor vehicle through the windshield, window, or sidewing.
>> a. The department shall adopt rules establishing a minimum measurable standard of transparency which shall apply to violations of this subsection.

Iowa Administrative Code 761-450.7(321) provides in pertinent part that:

> **450.7(1)** *Prohibition*. Except as provided in Iowa Code section 321.438(2), a person shall not operate on the highway a motor vehicle equipped with a front windshield, a side window to the immediate right or left of the drive (front side window) or a sidewing forward of and to the left or right of the driver (front sidewing) which is excessively dark or reflective.

> **450.7(2)** *Standard of transparency*. "Excessively dark or reflective" means that the windshield, front side window or front sidewing does not meet a minimum standard transparency of 70 percent light transmittance.

Here, Deputy Tweten was parked in his patrol car on a gravel crossover between the northbound and southbound lanes of a four-lane highway. (Tweten, Hr'g Test. at 5-

6.)  He observed the Charger pass in front of him and he believed that the Charger had illegally tinted windows.  (*Id.*)  Deputy Tweten initiated a traffic stop on the Charger. As he approached the Charger on the passenger's side of the vehicle, Deputy Tweten observed the passenger window being rolled down and smelled the odor of marijuana emanating from the vehicle.  (*Id.* at 8-9.)  Due to the odor of marijuana, Deputy Tweten felt there was a likelihood that he would search the Charger and for officer safety asked Defendant to accompany him to his patrol car while he checked Defendant's driver's license, insurance, and registration.  (*Id.* at 9-10.)  When Deputy Tweten informed Defendant that he intended to search the Charger, Defendant exited the patrol car, ignored Deputy Tweten's verbal commands to stay in the vehicle, resisted Deputy Tweten's attempt to physically restrain him, and attempted to run back to the Charger.  Ultimately, Deputy Tweten secured Defendant, placed him in handcuffs, and placed him in his patrol vehicle.  (*Id.* at 10-11.)  With Defendant secured, Deputy Tweten used a tint reader to measure the tint of the Charger's windows.  The tint reader demonstrated a 76 percent light transmittance.  (*Id.* at 11.)  Deputy Tweten testified that he had concerns as to the accuracy of his tint reader.  (*Id.*)  Thus, when Deputy Walderbach arrived on the scene, Deputy Tweten asked him to use his own tint reader on the Charger's windows.  Deputy Tweten testified that he recalled Deputy Walderbach's tint reader demonstrated a 72 to 73 percent light transmittance.  (*Id.* at 12.)

Deputy Tweten testified that he has stopped "no more than 20" and "possibly less than 15" other vehicles for suspected illegally tinted windows.  (*Id.*)  Deputy Tweten stated that, with regard to the other traffic stops for illegally tinted windows, he was "not aware of any times" that he was incorrect as to the tint being illegal.  (*Id.* at 13.)  Deputy Walderbach testified that when he tested the tint on the Charger's window, it was legal at more than 70 percent light transmittance.  He did not recall whether the tint reader provided 72 or 73 percent light transmittance.  (*Id.* at 40.)  Deputy Waderbach stated that

the tint reader findings surprised him. He stated that, "When I looked from the outside into the vehicle, yes. I thought it was going to be darker than what it was." (*Id.*)

In *United States v. Maurstad*, 35 F.4th 1139 (8th Cir. 2022), the defendant was pulled over for driving a car with illegally tinted windows. *Id*. at 1142. The defendant argued that law enforcement lacked reasonable suspicion to stop him. *Id*. at 1143. The Eighth Circuit Court of Appeals determined that:

> The . . . stop was initiated because an officer believed that the tint on [the defendant's] windows violated state law. . . . [The defendant] points out that the tint was not illegal because it fell into an exception for manufacturer-tinted windows. As a result, he argues, there was no reasonable suspicion to pull him over. But the officer's observation was right—the windows were too dark under the statute. Although they were exempt and therefore lawful, there was no way for the officer to know that before pulling [the defendant] over, so his mistake was objectively reasonable. . . . The district court did not err in finding that the officer had reasonable suspicion to stop [the defendant.]

*Id*.

In *United States v. Wallace*, 213 F.3d 1216 (9th Cir. 2000), a police officer, who mistakenly believed that any tinting of a vehicle's front widows was illegal, conducted a traffic stop on the defendant's car. *Id*. at 1217. The Ninth Circuit Court of Appeals found that the traffic stop was not unlawful and that police officer had objective, probable cause to believe that the defendant's windows were illegally tinted. *Id*. at 1221. The Ninth Circuit explained that:

> That [the officer] had the mistaken impression that all front-window tint is illegal is beside the point. [The officer] was not taking the bar exam. The issue is not how well [the officer] understood California's window tinting laws, but whether he had objective, probable cause to believe that these windows were, in fact, in violation. The undisputed facts show that he did. Although not essential to the probable cause analysis, the subsequent measurement of the level of light transmittance at 29% corroborates [the officer's] observations. This is analogous to the case of an officer finding in someone's pocket a baggie containing a green leafy substance and rolling

14

papers; there is probable cause to believe that the substance is marijuana even though it will not be known for certain until the laboratory report is received. In our case, [the officer's] observations correctly caused him to believe that [the defendant's] window tinting was illegal; he was just wrong about exactly why.

*Id*. at 1220.

In *United States v. Ochoa*, 539 F.Supp.3d 504 (E.D.N.C. 2021), the defendant's vehicle was pulled over based on suspicion that the vehicle's windows were illegally tinted in violation of North Carolina state law. *Id*. at 506. Pertinent facts in *Ochoa* included that the officer "alone observed [the d]efendant's vehicle's windows before stopping [the] vehicle and [the officer's] suspicion that the windows were illegally tinted was later shown by the light meter to be unfounded." *Id*. at 512. The district court addressed the fact that the officer's suspicion that the defendant's vehicle was illegally tinted was ultimately demonstrated to be unfounded. The district court explained that:

> As mentioned above, [the officer] estimated when he initiated the traffic stop that [the d]efendant's vehicle's windows allowed 25% light transmission and thus were not compliant with [the statute's] 35% requirement, but the light meter ultimately showed that [the d]efendant's windows allowed 37% light transmission and therefore were legal. [The d]efendant argues that these facts establish that [the officer] was unable to effectively estimate the light transmission allowed by a tinted window, and that this inability rendered the traffic stop unreasonable within the meaning of the Fourth Amendment.

*Id*. The district court pointed out that under Supreme Court precedent, "[t]o be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them fair leeway for enforcing the law in the community's protection" and "[t]he limit is that the mistakes must be those of reasonable men." *Id*. (first alteration in original) (quoting *Heien v. North Carolina*, 574 U.S. 54, 60-61 (2014)). The district court determined that:

15

[The officer's] mistake was that of a reasonable man. First, the difference between [the officer's] estimation that [the d]efendant's windows might be illegally tinted and the reality that they were not fails to convince the court that [the officer] was unable "to estimate window tint with a reasonable degree of accuracy" or to reasonably suspect that [the d]efendant's vehicle was not compliant with [the North Carolina statute]. Without question, [the officer] was not required to be certain that [the d]efendant's vehicle's windows were illegal in order to stop the vehicle to investigate whether that was the case. *See United States v. Arvizu*, 534 U.S. 266, 277, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) ("A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct."); [*United States v. ]Jones*, 500 F. App'x [216,] 218 [(4th Cir. 2012)] (no error because officers had reasonable suspicion that windows were "*potentially* illegally tinted" (emphasis added)). Second, [the officer] testified at the hearing on [the d]efendant's motion to suppress that he: (1) was field-trained in enforcing window-tint violations at the beginning of his ten-year career in law enforcement; (2) has stopped hundreds of vehicles on suspicion of violating window-tint laws; and (3) has been correct about suspected window-tint violations in almost every instance. While such training, experience, and prior accuracy alone would likely not render reasonable a law-enforcement officer's decision to stop any vehicle to investigate suspicion, e.g., that windows ultimately measured as allowing 99% light transmission might allow less than 35% light transmission, in this case the light meter showed that [the d]efendant's windows allowed 37% light transmission, a mere 2% above the legal threshold. Thus, rather than "conclusively establish[ing the officer's] *inability* to estimate window tint" as [the d]efendant suggests, the court concludes that the light meter's reading—which confirmed that [the d]efendant's vehicle's windows were on the margins of illegality—tends to confirm [the officer's] *ability* to estimate window tint with reasonable accuracy. The more closely that behavior—while legal—approximates illegal behavior, the more reasonable suspicion regarding and investigation of that behavior by law enforcement becomes. Thus, while doing so was not in and of itself illegal, that [the d]efendant had his windows tinted to within 2% of [the statute's] 35% threshold certainly rendered more reasonable [the officer's] suspicion that [the d]efendant's windows were illegally tinted, and rendered reasonable [the officer's] mistake. Indeed, if there is such a thing as a reasonable mistake regarding whether a window is illegally tinted, a 2% error must fall within the bounds of reasonableness. Finally, like the district court

16

in *Jones*, the court has itself reviewed the video evidence submitted by the [g]overnment and finds that [the d]efendant's windows "did in fact appear to be dark" at the time of the stop and were "dark enough" for [the officer] to reasonably suspect that they were "potentially illegally tinted" and therefore to stop [the d]efendant's vehicle to "check out" the windows with a light meter. *Jones*, 500 F. App'x at 218. In sum, because [the d]efendant's vehicle's windows appeared to be "potentially illegally tinted[,]" and were later shown to be only marginally legal, the court concludes that [the officer's] mistake did not render the traffic stop unreasonable for Fourth Amendment purposes.

*Id*. at 512-13.

In *United States v. Garcia*, 279 F.Supp.2d 294 (S.D.N.Y. 2003), officers pulled over the defendant's vehicle for excessively tinted windows. *Id*. at 298. Excessively tinted windows are illegal under New York law and cannot have a light transmittance of less than 70 percent. *Id*. at 299. The officers who pulled the defendant over did not test the tint on the defendant's vehicle. *Id*. Nevertheless, the district court determined that:

The fact that [the officers] never tested the windows with a "tint meter" to determine if they were, in fact, in violation of the law is immaterial, as only an objectively reasonable belief or suspicion of a violation, supported by articulable facts, is required. *See* [*United States v.*] *Harrell*, 268 F.3d [141.] 149 [(2d Cir. 2001)] (probable cause to stop car existed because "an 'objectively reasonable' police officer would have suspected the windows were tinted in violation of § 375(12 a)(b) of the Vehicle & Traffic Law"); *accord* [*United States v.*] *Scopo*, 19 F.3d [777,] 781–82 [2d Cir. 1994)]; *see also United States v. Wallace*, 213 F.3d 1216, 1220 (9th Cir. 2000) (holding that an officer's misunderstanding of the tinting law was immaterial because the officer "was not taking the bar exam. The issue is not how well [the officer] understood California's window tinting laws, but whether he had objective, probable cause to believe that these windows were, in fact, a violation."). [The officer] formed such a properly-supported belief prior to the time he and the other officers stopped the green sedan. . . . Since the officers had probable cause to stop the green sedan based on the suspected tint violation, the officers' initial traffic stop of the green sedan was lawful. Therefore, [the defendant's] motion to suppress the evidence obtained as a result of the stop is denied.

*Id.* at 299; *see also United States v. Gonzalez-Perez*, No. 8:21CR284, 2022 WL 17569844, at *4 (D. Neb. Nov. 9, 2022), report and recommendation adopted, No. 8:21CR284, 2022 WL 17551766 (D. Neb. Dec. 9, 2022) ("[E]ven if [the trooper] had been incorrect in his assessment of the light transmittance before initiating the stop, this does not mean his belief that the [vehicle] was in violation of the law was objectively unreasonable"); *United States v. Benson*, No. 8:22CR3, 2022 WL 4280579, at *4 (D. Neb. Aug. 10, 2022), report and recommendation adopted, No. 8:22CR3, 2022 WL 4278664 (D. Neb. Sept. 15, 2022) ("[E]ven if [the deputy] had been incorrect in his assessment of the light transmittance before initiating the traffic stop, his belief that the vehicle was in violation of [the Nebraska statute] was objectively reasonable, judging from the photographs of the windows which were offered at the evidentiary hearing"); *United States v. Morgan*, No. 17 Cr.354 (KBF), 2017 WL 4621632, at *5 (S.D.N.Y. Oct. 12, 2017) ("Even if evidence were offered that his windows were not illegally tinted . . . this [c]ourt would still find that the officer had probable cause to stop the defendant's vehicle based on his observation that the windows appeared to be illegally tinted. At the very least, there were articulable facts in support of a reasonable suspicion. In light of the objective evidence, the defendant's testimony, and the subjective beliefs of the officers, it is beyond controversy that an 'objectively reasonable officer' might have suspected the windows were tinted. . . . This is all that the law requires.").

I find that Deputy Tweten had reasonable suspicion to conduct the *Terry* stop based on a suspected traffic violation—the Charger's windows were illegally tinted. Even though the tint of the Charger's widows was ultimately found to be legal, Deputy Tweten's mistake was objectively reasonable. Indeed, Deputy Tweten's tint reader demonstrated a 76 percent light transmittance. Further, Deputy Tweten recalled that Deputy Walderbach's tint reader demonstrated a 72 to 73 percent light transmittance. The Charger's windows were 2 percent to 6 percent above the 70 percent legal threshold,

which shows that Deputy Tweten had the ability to estimate window tint with reasonable accuracy. *See Ochoa*, 539 F.Supp.3d at 513 ("The more closely that behavior—while legal—approximates illegal behavior, the more reasonable suspicion regarding and investigation of that behavior by law enforcement becomes."). Further, Deputy Waderbach stated that the tint reader findings surprised him, "When I looked from the outside into the vehicle, yes. I thought it was going to be darker than what it was." (Waderbach Hr'g Test. at 40.) *See United States v. Jones*, 500 Fed. App'x 216, 218 (4th Cir. 2012) (finding an officer's traffic stop for potentially illegal window tint to be objectively reasonable when that suspicion of illegal window tint was corroborated by a second officer). Additionally, while Deputy Tweten has been a law enforcement officer for a short while, he credibly testified that he had conducted 15-20 traffic stops for suspected illegally tinted windows and was "not aware of any times" that he had been incorrect as to the tint being illegal. (Tweten Hr'g Test. at 12-13.) *See Ochoa*, 539 F.Supp.3d at 513.

Furthermore, I have reviewed Defendant's Exhibit C, body camera footage of Deputy Tweten using his tint reader on the Charger, and, while the window tint is not so dark that you cannot see into the Charger, the fact that the windows are tinted is clearly visible. I do not find that Deputy Tweten's body camera footage undermines his credibility or calls into question his reasonable suspicion that the Charger's windows were illegally tinted at the time he initiated the *Terry* stop. Similarly, Defendant's Exhibits D and E, photographs of the Charger and photographs of other exemplar vehicles not associated with Defendant's case, do not undermine Deputy Tweten's credibility or call into question his reasonable suspicion that the Charger's windows were illegally tinted at the time he initiated the *Terry* stop. All of the photographs were taken on a cell phone at a different time of day than the *Terry* stop and while the vehicles were stationary and at closer distances than when Deputy Tweten observed the Charger. Therefore,

based on the totality of the circumstances, I find that Deputy Tweten had reasonable suspicion to stop Defendant for having illegally tinted windows and, even though Deputy Tweten's suspicion was mistaken, the mistake was objectively reasonable. *See Maurstad*, 35 F.4th at 1143; *Morgan*, 2017 WL 4621632, at *5 ("Even if evidence were offered that his windows were not illegally tinted . . . this [c]ourt would still find that the officer had probable cause to stop the defendant's vehicle based on his observation that the windows appeared to be illegally tinted. At the very least, there were articulable facts in support of a reasonable suspicion. In light of the objective evidence, the defendant's testimony, and the subjective beliefs of the officers, it is beyond controversy that an 'objectively reasonable officer' might have suspected the windows were tinted. . . . This is all that the law requires"); *Gonzalez-Perez*, 2022 WL 17569844, at *4 ("[E]ven if [the trooper] had been incorrect in his assessment of the light transmittance before initiating the stop, this does not mean his belief that the [vehicle] was in violation of the law was objectively unreasonable.").

> ### 2.   *Whether Defendant's actions after the stop justify the search*

Alternatively, if the Court finds that the *Terry* stop was invalid, the Government argues that "even if the initial traffic stop was unlawful, [D]efendant's actions made the search of his vehicle lawful and evidence should not be suppressed." (Doc. 28-1 at 6.) Specifically, the Government argues that Defendant's "attempt to resist and run to his vehicle was a new and distinct crime that supported [D]efendant's arrest and therefore evidence discovered after this offense need not be suppressed." (*Id.* at 5.) I am unpersuaded by the Government's argument. While Defendant's actions may have constituted a separate offense for which he could have been arrested, it does not necessarily follow that law enforcement was justified in making a warrantless search of his vehicle.

The Government cites several cases in support of its argument; however, I find these cases distinguishable from the circumstances in the present case. In *United States v. Sledge*, 460 F.3d 963 (8th Cir. 2006) a police officer observed a car pull into a liquor store parking lot. A second car pulled into the parking lot a short time later. The driver of the second car spoke with an individual on the passenger side of the first car and shook hands and exchanged "money or something." *Id*. at 964. The driver of the second car went into the liquor store and came out with an 18-pack of beer and gave it to the rear passenger side passenger in the first car. "Believing he had just witnessed the illegal procurement of alcohol for a minor, [the police officer] drove his cruiser across the street and parked behind the first car, preventing it from leaving." *Id*. The officer requested assistance and an additional police officer arrived on the scene. While the officer who witnessed the exchange was talking to the driver of the first car, another officer asked the defendant to exit the first car. The officer began a pat down search of the defendant, but the defendant turned and tried to run away. The officer grabbed the defendant resulting in a struggle. Two additional officers came to assist in the struggle with the defendant and when the defendant was returned to a standing position, he was handcuffed. *Id*. at 965. The defendant was placed under arrest for failing to comply and resisting arrest. While searching the defendant incident to arrest, officers located $229 in cash and three baggies containing an off-white substance that field-tested positive for crack cocaine. *Id*. The Eighth Circuit held that "even assuming *arguendo* the detention and pat-down search of [the defendant] were invalid . . . [the defendant's] actions provided independent grounds for his arrest. Because the officer lawfully could arrest [the defendant] for obstructing a peace officer . . . or for resisting arrest . . . the district court correctly held the crack cocaine discovered in the search incident to the lawful arrest is admissible." *Id*. at 967-68. Thus, while *Sledge* stands for the proposition that obstruction or resisting arrest may create separate grounds for arrest and a concomitant search of a

21

person incident to arrest, it does little, if anything, to support search of a vehicle associated with that person.

In *United States v. Hunt*, 372 F.3d 1010 (8th Cir. 2004), the defendant was a passenger in a vehicle stopped for speeding. A drug dog called to the scene alerted on the vehicle's trunk. Law enforcement found 25 pounds of cocaine inside the trunk. The defendant was arrested and taken to the police station where he requested an attorney. A DEA agent asked the defendant whether he would be willing to cooperate with law enforcement. The defendant asked the agent, "How much money would it take for you to keep the dope and for us to go home?" *Id.* at 1012. The defendant was charged with drug offenses and obstruction of justice for trying to bribe the agent. After the drugs were suppressed, the defendant was tried and convicted on the obstruction of justice charge only. *Id.* On appeal, the defendant argued that his statement offering money to the agent should have been suppressed because it was "the product of an illegal detention and arrest and was obtained in violation of his Fourth Amendment . . . rights." *Id.* The Eighth Circuit held that, "[w]hen a defendant commits a new and distinct crime during an unlawful detention, the Fourth Amendment's exclusionary rule does not bar evidence of the new crime." *Id.* (citations omitted).

In one sense, *Hunt* is inapplicable on its face. The defendant's statement was admissible regarding the "new crime," i.e., the obstruction charge. Nothing about *Hunt* implies that the defendant's new crime makes the illegally seized evidence admissible with respect to either the obstruction or the drug offenses. At best, the Government is hinting at a possible chain of events by which the new offense somehow makes the seized drugs, firearm, and switch admissible. At the hearing, the Government argued:

> Now, defense counsel valiantly tries to tell you, well, the car doesn't matter for the interference because he doesn't actually get there. Well it does matter, and it would be evidence and it would be important what's in there, because if we were prosecuting a case for interference, ultimately the

defendant's motive for why he wants to get back to that vehicle would have been an important and relevant portion of any case presented. And it certainly is important because the whole purpose of his interference at that time and running back towards the vehicle is because he knows what's in it. He knows that there's a gun with a switch. He knows that there's marijuana. Ultimately, that's what leads to his federal charges.

Defendant is not, however, being tried for interference with illegal acts. Assuming that Defendant's motive regarding this interference charge is relevant, it may be admissible under the rules of evidence. *United States v. Noland*, 960 F.2d 1384, 1388 (8th Cir. 1992) ("[E]vidence of an appellant's motive is generally admissible where relevant."). Theoretically, the presence of those items in the Charger may make it more likely that Defendant was attempting to return to his vehicle to hide or dispose of evidence. However, the Government offers no explanation regarding how the items Defendant seeks to suppress were lawfully seized if the initial stop was flawed. In other words, the Government does not suggest, for example, that the items would have been inevitably discovered in the vehicle as a result of subsequent lawful search or vehicle inventory.

The Government also relies upon *United States v. Dawdy*, 46 F.3d 1427 (8th Cir. 1995). In *Dawdy*, around 10:00 p.m. a state trooper observed a vehicle parked behind a closed pharmacy. The vehicle was occupied with the lights off. The trooper entered the parking lot to investigate. As the trooper entered the parking lot, the defendant turned his car around and drove toward the entrance of the lot. The trooper indicated that the defendant should stop, and he did. The trooper took the defendant's driver's license to run a warrant check. The trooper observed the defendant drop a key from the open window of his car, the trooper picked it up and returned it to the defendant. Another trooper who arrived on the scene found a leather pouch containing a white powdery substance lying near the car. The first trooper asked the defendant to exit the vehicle and he was placed under arrest. However, when the trooper attempted to handcuff the

23

defendant, he resisted and threw away the key that he had dropped earlier. A search of the defendant revealed a large amount of cash and a search of the interior of the vehicle revealed a small scale. During an inventory search of the car, law enforcement realized that the key to the trunk was missing. Law enforcement searched the area where the defendant had thrown it away and found it. Inside the trunk law enforcement found more white powder, both the powder from the pouch and the trunk field tested positive as an amphetamine. *Id*. at 1428-29. The district court suppressed all the evidence except for the leather pouch found near the vehicle. *Id*. at 1429. The Eighth Circuit reversed the district court and held, among other things, that "a defendant's response to even an invalid arrest or *Terry* stop may constitute independent grounds for arrest." *Id*. at 1431. Further, the Eighth Circuit stated that, "assuming arguendo that [the trooper's] initial stop and arrest of [the defendant] were invalid, [the defendant's] resistance provided independent grounds for his arrest, and the evidence discovered in the subsequent searches of his person and his automobile is admissible." *Id*. It is important to note that *Dawdy* predated *Gant* by 14 years and that *Dawdy* contained no discussion of why the "independent grounds for [ ] arrest" provided a basis to extend the search to the vehicle.

These cases are all distinguishable from the present case. Unlike this case, where Defendant's vehicle was searched based on Deputy Tweten smelling the odor of marijuana emanating from Defendant's vehicle after the initial *Terry* stop for suspected illegally tinted windows, in *Sledge* money and drugs were found on the defendant's person which was searched incident to arrest after he attempted to flee from an initial pat-down search. In *Hunt*, the defendant was prosecuted for an obstruction of justice charge stemming from attempting to bribe a DEA agent after he was arrested for having drugs in his vehicle. While the drugs found in the vehicle were suppressed, the defendant's statements to the DEA agent attempting to bribe the DEA agent were not suppressed, as the obstruction charge was a new and distinct crime. In *Dawdy*, the

24

defendant was observed at 10:00 p.m. parked in the parking lot of a closed pharmacy and stopped when he attempted to leave the parking lot after seeing the trooper enter the parking lot. While the trooper was running the defendant's license, a second trooper arrived and found a leather pouch containing a white powdery substance next to the car. The defendant was arrested and resisted arrest. Because the defendant resisted arrest, a new and distinct crime occurred, and the Eighth Circuit determined that even if the *Terry* stop and initial arrest were invalid, the search of the defendant incident to arrest and subsequent search of his vehicle were valid. While in some respects this case is factually closer to the instant case, it remains distinguishable because drugs were found next to the car, the defendant's arrest occurred next to the car, and defendant threw the key to the truck, where drugs were found, away from the car. In the instant case, unlike *Dawdy*, when Defendant attempted to go back to his vehicle he was not under arrest, he was not near the car, and no drugs had been found near the car or on Defendant's person.

Finally, the Government cites *McElree v. City of Cedar Rapids, Iowa*, 372 F.Supp.3d 770, 791 (N.D. Iowa 2019) for the proposition that "[e]ven fleeing from an unjustified *Terry* stop creates probable cause for an arrest for interference of official acts." (Doc. 28-1 at 6.) While this is a correct statement of the law, it is irrelevant to the circumstances present in this case, as no one is arguing that probable cause did not exist to arrest Defendant for interference with official acts when he attempted to run back to the Charger. *See McElree*, 372 F.Supp.3d at 791 ("[E]ven if the officers were not justified in conducting a *Terry* stop . . . they had probable cause to arrest [the defendant] for interference with official acts once he resisted and started to run."). There was no vehicle search in *McElree*.

Moreover, under *Gant*, "[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains

evidence of the offense of arrest." *Arizona v. Gant*, 556 U.S. 332, 351 (2009). Here, the first alternative of the *Gant* standard is not met. Defendant was not within reaching distance of the passenger compartment of the Charger when the vehicle was searched.

Whether the second alternative of the *Gant* is met requires more reflection. At the hearing, it was established that Defendant was asked to exit the Charger and go to Deputy Tweten's vehicle because of the suspicion about the tinting on the windows and, after the Deputy's first encounter with Defendant, suspicion about marijuana use. Deputy Tweten relatively quickly made his decision to search the vehicle based on the evidence of marijuana use. Deputy Tweten's concern for safety also motivated the decision to remove Defendant from the Charger. The evidence seems to support a charge that Defendant interfered with official acts as the crime is defined by Iowa Code Section 719.1, "A person commits interference with official acts when the person knowingly resists or obstructs anyone known by the person to be a peace officer . . . in the performance of any act which is within the scope of the lawful duty or authority of that officer." *State v. Donner* held,

> "The word 'resist' as used in § [719.1] is limited to obstructive conduct but does not require the employment of actual violence or direct force. It is sufficient if the person charged engaged in actual opposition to the officer through the use of actual or constructive force making it reasonably necessary for the officer to use force to carry out his duty.

243 N.W.2d 850, 854 (Iowa 1976). Therefore, Deputy Tweten had probable cause to believe Defendant committed such interference. However, the Government's argument regarding the grounds to search arising from this conclusion is highly speculative, if not entirely theoretical.

First, there is no evidence that Defendant was ever charged with interference. The absence of this charge is not surprising given the much more serious charges that arose from the encounter. However, the absence does tend to make the prospect of a search

26

of the Charger seem all the more theoretical. There was no testimony to establish that, absent the evidence of marijuana use, Deputy Tweten would have conducted a search incident to an arrest for interference with official acts or that such a search would have uncovered the same evidence that the Government seeks to introduce in the instant prosecution.[9]

Second, the search of the Charger was clearly premised on Officer Tweten's testimony that he smelled marijuana in the vehicle and Defendant's admission regarding the presence of "roaches." If all the evidence prior to Defendant's alleged commission of a new offense is suppressed (contrary to my recommendation), it becomes difficult to conclude it was "reasonable to believe the vehicle contain[ed] evidence" of interference with official acts. Without the suppressed evidence, Officer Tweten is left with no more than speculation about the presence of anything in the Charger that might relate to Defendant's interference. In *Knowles v. Iowa,* the United States Supreme Court held unconstitutional a state law permitting officers to search a car and driver where they merely issued a traffic citation. 525 U.S. 113 (1998). The rationale underpinning this "search incident to citation" statute was "that so long as the arresting officer had probable cause to make a custodial arrest, there need not in fact have been a custodial arrest." *Id.* at 115–16. This reasoning, the Court held was too far removed from the justification for unwarranted searches of vehicles incident to arrest. *Knowles* reasoned,

> Iowa nevertheless argues that a "search incident to citation" is justified
> because a suspect who is subject to a routine traffic stop may attempt to

---

[9] I note the Government's alternative theory seems akin to the doctrine of inevitable discovery although the doctrine is not cited and the argument is far from fleshed out. *See United States v. McManaman*, 673 F.3d 841, 846 (8th Cir. 2012) ("Evidence is purged of taint and should not be suppressed "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means") (alteration in original) (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984))). That is, even if the evidence must be suppressed, it would have inevitably discovered as a result of a search prompted by Defendant's new offense.

hide or destroy evidence related to his identity (e.g., a driver's license or vehicle registration), or destroy evidence of another, as yet undetected crime. As for the destruction of evidence relating to identity, if a police officer is not satisfied with the identification furnished by the driver, this may be a basis for arresting him rather than merely issuing a citation. As for destroying evidence of other crimes, the possibility that an officer would stumble onto evidence wholly unrelated to the speeding offense seems remote.

*Id.* at 118. The instant case raises similar concerns about the remoteness of the possibility that a vehicle search will result in evidence of interference with official acts. Under these circumstances, it is no more probable that someone in Defendant's position is interfering with official acts to destroy evidence (i.e., the motive for the interference, as the Government argues) than it is he is simply choosing to leave the scene. Accordingly, I am unpersuaded by the Government's argument in the alternative should the Court find that Deputy Tweten initiated an invalid *Terry* stop. Thus, if the Court disagrees with me regarding the lawfulness of the initial stop of the Charger, then I recommend the Court hold the search to be unlawful because the subsequent offense (resisting arrest) did not provide grounds for the search.

## IV.    CONCLUSION

For the reasons set forth above, I respectfully recommend the District Court **deny** Defendant's Motion to Suppress. **(Doc. 25.)**

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to

appeal from the findings of fact contained therein. *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir. 2009).

      **DONE AND ENTERED** at Cedar Rapids, Iowa, this 12th day of July, 2023.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa