# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 23-CR-2020-CJW-MAR |
| Plaintiff, | **ORDER** |
| vs. | |
| JAMAL BRANDON SMITH, | |
| Defendant. | |

## I. INTRODUCTION

This matter is before the Court on defendant's Motion to Suppress. (Doc. 25). The government filed a timely resistance. (Doc. 28). The Court referred defendant's motion to the Honorable Mark A. Roberts, United States Magistrate Judge, for a Report and Recommendation ("R&R"). On June 9, 2023, Judge Roberts held a hearing on the motion to suppress. (Doc. 29). Then, on July 12, 2023, Judge Roberts recommended the Court deny defendant's motion to suppress. (Doc. 32). Defendant objected to Judge Roberts' R&R. (Doc. 34). For the following reasons, the Court **overrules** defendant's objections, **adopts** Judge Roberts' R&R, and **denies** defendant's Motion to Suppress.

## II. STANDARD OF REVIEW

The Court reviews Judge Roberts' R&R under the statutory standards found in Title 28, United States Code, Section 636(b)(1):

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

*See also* FED. R. CIV. P. 72(b) (stating identical requirements). While examining these statutory standards, the United States Supreme Court explained:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue de novo if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a de novo or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985). Thus, a district court may review de novo any issue in a magistrate judge's report and recommendation at any time. *Id*. If a party files an objection to the magistrate judge's report and recommendation, the district court must review the objected portions de novo. 28 U.S.C. § 636(b)(1). In the absence of an objection, the district court is not required "to give any more consideration to the magistrate [judge]'s report than the court considers appropriate." *Thomas*, 474 U.S. at 150.

### III. FACTUAL BACKGROUND

After reviewing the hearing transcript (Doc. 33), the Court finds that Judge Roberts accurately and thoroughly set forth the relevant facts in the R&R. The Court adopts Judge Roberts' summary of the facts here, with minor modifications as noted below, to reflect objections to findings of fact. When relevant, the Court relies on and discusses additional facts in conjunction with its legal analysis.

> At approximately 5:40 p.m. on June 16, 2022, Chickasaw County Sheriff's Office Deputy Cole Tweten conducted a routine traffic stop on Highway 218 for what he suspected to be illegally tinted windows on a red Dodge Charger. (Doc. 26.) Deputy Tweten's subsequent report noted that Defendant was also leaning back behind the B pillar of the vehicle, which he believed to be a possible indicator of criminal activity. (*Id*.) Deputy Tweten had about ten to fifteen seconds to view Defendant's window tinting and seat position as the Charger drove past. (Tweten, Hr'g Test. at 19.) As Deputy Tweten drove behind Defendant, he ran the Charger's license plate on his in-car computer and was alerted that the registered vehicle

2

Case 6:23-cr-02020-CJW-MAR   Document 37   Filed 08/09/23   Page 2 of 12

owner had "violent tendencies." (*Id.* at 6.) A "violent tendencies" alert indicates that an individual has previously come into contact with law enforcement in a violent capacity. (*Id.*) After pulling over the Charger, Deputy Tweten initially approached it without his tint reader for safety purposes. (*Id.*) A strong odor of marijuana was coming from the interior of the vehicle. (*Id.*) Defendant provided Deputy Tweten his driver's license and insurance information. (Gov. Exhibit C). Deputy Tweten communicated to Defendant that if the tinting was [il]legal, he would receive a warning. (*Id.*)

Noting the violent tendencies alert and the strong marijuana odor, Deputy Tweten asked the Defendant to join him in his patrol vehicle while he ran his information. (*Id.*) The computer system in the patrol vehicle reported that Defendant had a "no contact" order and was prohibited from owning a firearm. (*Id.*) When asked about the marijuana odor, Defendant denied there were any illegal items in the vehicle. (*Id.*) However, after further questioning, Defendant acknowledged the presence of burnt marijuana. (*Id.*) Deputy Tweten notified Defendant that he would be searching the vehicle and ordered Defendant to remain in the patrol vehicle. Deputy Tweten then assured Defendant that, if there were only burnt marijuana "roaches," then he would throw the burnt marijuana remnants in the grass and let Defendant proceed to work. Defendant became increasingly nervous and admitted there was marijuana in the trunk of his vehicle, but firmly denied possessing a firearm.

Defendant opened the car door and was ordered to stay inside the patrol vehicle. (*Id.*) Defendant disregarded several orders to remain seated and attempted to return to his vehicle on foot. Deputy Tweten took Defendant by the arm and ordered him to return to the patrol vehicle. Defendant freed his arm from Deputy Tweten's grip and began running back to his vehicle. Defendant did not reach his vehicle and was taken to the ground. He was then placed in handcuffs for officer safety. Deputy Tweten's body camera momentarily stopped recording when it was hit during the physical altercation. Defendant was placed in the patrol vehicle for the remainder of the stop and vehicle search.

Deputy Chad Walderbach arrived at the scene as backup while Defendant was handcuffed and seated in the back of Deputy Tweten's patrol vehicle. (Doc. 26.) When Deputy Walderbach approached the Charger, the driver's side window was partially rolled down and the passenger side window was up. (Walderbach, Hr'g Test. at 42.) He could clearly view the steering wheel and the dashboard through the tint. (*Id.*) Deputy

3

Walderbach then completed a second tint-reading and assisted with the search of the Charger. (*Id.*) He did not have any interaction with Defendant. (Walderbach, Hr'g Test. at 41.) Iowa window tinting standards require that the front windshield and front-side windows have at least 70% light transmittance. Iowa Code Section 321.438(2) (2022); Iowa Admin. Code r. 761-450.7(321), 450.7(2) ("'Excessively dark or reflective' means that the windshield, front side window or front sidewing does not meet a minimum standard of transparency of 70 percent light transmittance.") Deputy Tweten's tint-reading result was 75-76% and Deputy Walderbach's reading was 72-73%. Thus, Defendant's window tint provided sufficient light transmission under Iowa law and he was not issued any traffic citations. (Doc. 26 at 2.)

The deputies' search of the Charger produced the following: a P80 9x19mm firearm, a magazine, ammunition, a switch device, marijuana, cannabis edibles, psilocybin mushrooms, small plastic baggies, and a scale. (*Id.*) Defendant was read and acknowledged his *Miranda* rights when arrested. (Tweten, Hr'g Test. at 15.) Defendant made several unsolicited statements while being transported to jail in the patrol vehicle by Deputy Tweten. Defendant stated that he believed the firearm was legal, but that it was just unregistered. (*Id.*) He declined to participate in an interview at the Chickasaw County Jail. At the jail, $100 and a blue iPhone were seized from Defendant's person.

Law enforcement obtained a warrant and executed a search warrant for the contents of the iPhone on June 20, 2022. (Doc. 26-1.) The phone contained photos and videos of large amounts of marijuana and marijuana usage. (Tweten, Hr'g Test. at 14.) There was also a series of internet searches related to 3D-printed switches and automatic gun laws in Iowa. (*Id.*) A switch attachment is used to make a firearm shoot automatically. (*Id.*)

Deputy Tweten was questioned about his training in connection with suspected criminal activity. (Tweten, Hr'g Test. at 16.) Approximately one month before the traffic stop, in May of 2022, he attended a course regarding traffic stops and interdiction. (*Id.*) He learned of signs to look for while conducting his normal enforcement that may indicate criminal activity. (*Id.*) In his affidavit in support of the search warrant, he stated that a driver leaning back was a possible indicator of criminal activity. (Doc. 26-1 at 3.)

Deputy Tweten's report states:

> My attention was also drawn to this vehicle specifically because as the vehicle passed me, the driver of the vehicle had leaned back behind the B pillar of the vehicle and no driver could be seen as it went by.

(Doc. 26, Def. Ex. B.) Deputy Tweten's affidavit states:

> As the vehicle passed me the driver of the vehicle had leaned back behind the B pillar of the vehicle and no driver could be seen as it went by. From my training and experience I knew this among other reactions to the presence of law enforcement to be a possible indicator of criminal activity.

(Doc. 26-1.) These written statements are somewhat confusing about when the driver leaned back, i.e., whether the driver of the Charger was simply driving along in a reclined position or if he was observed by Deputy Tweten moving into a reclined position, perhaps in response to seeing a patrol vehicle.

At the hearing, Deputy Tweten testified that the driver of the Charger had already reclined before the Charger came into the deputy's field of vision. (Tweten, Hr'g Test. at 32.) I find all these statements to be consistent, even if the affidavit and the report might have been drafted more clearly. The fact that the driver was reclined when Deputy Tweten first observed the vehicle does not eliminate the possibility that Defendant saw the patrol vehicle and reacted to the presence of law enforcement before Deputy Tweten observed him. However, it does eliminate the possibility of Deputy Tweten relying on that reaction as a basis to suspect Defendant. Ultimately, the Government and Deputy Tweten denied Defendant's reclined position formed part of the justification for the stop.

Moreover, as discussed below, even if Deputy Tweten thought something was suspicious about the driver's position, his subjective belief does not matter. He testified that he had seen other drivers seated in this manner (i.e., "that sort of behavior") and then came across other criminal behavior. (*Id.* at 16-17.) He testified that documenting such behavior "is potentially helpful in the investigation as to the items that were found in the vehicle as well." (*Id.* at 17.)

Both deputies testified regarding their limited knowledge of the tint readers used in the field. (Tweten, Hr'g Test. at 11.) At the hearing both Deputy Tweten and Deputy Walderbach stated that they did not need to calibrate the tint readers, nor did they receive any specific or recent training regarding use of such devices. ((*Id.* at 29.); (Walderbach, Hr'g Test. at 43.)) They had been instructed to simply place the device on the glass and wait for the percentage of light transmittance to appear on the digital screen.

5

(*Id.*)  Deputy Walderbach did not know the model or manufacturer of the tint-reading devices used in the field.  (Walderbach, Hr'g Test, at 43.)  Both deputies were also unaware of any maintenance or calibration recommended by the manufacturer.  ((Tweten, Hr'g Test. at 29.); (Walderbach, Hr'g Test, at 44.))

At the hearing, an investigator with the Federal Public Defender's Office for the Northern and Southern Districts of Iowa, Tina Debban, testified regarding photographs of Defendant's Charger and other unrelated vehicles to depict their window tinting.  (Debban, Hr'g Test. at 48.)  Ms. Debban regularly reviews discovery files for ongoing cases.  (*Id.*)  As part of her investigative duties, she photographed Defendant's vehicle and other exemplar vehicles using her phone's standard settings.  (*Id.* at 60.)  The photographs captured by Ms. Debban are found in Defendant's Exhibits D and E.  (*Id.*)  Ms. Debban does not have any training or experience regarding window tinting.  (*Id.* at 59.)

## IV. ANALYSIS

In the Motion to Suppress, defendant argues that Deputy Tweten lacked both reasonable suspicion and probable cause to initiate the initial stop of defendant's vehicle and that any evidence or fruits obtained from the stop, subsequent search of defendant and his phone, and any statements defendant made to officers, should be suppressed. (Doc. 25-1, at 3-5).

In his R&R, Judge Roberts recommended the Court deny defendant's motion. (Doc. 32).  Judge Roberts found Deputy Tweten had reasonable suspicion to stop the vehicle for the perceived traffic violation of illegal tint.  (*Id.*, at 18-20).  Judge Roberts also found that in the alternative, were the Court to find the *Terry* stop invalid, the search and all fruits must be suppressed because the subsequent offense of resisting arrest did not provide independent grounds for the search.  (*Id.*, at 20-28).

Defendant objects to Judge Roberts' findings in the R&R that: (1) Deputy Tweten had concerns about the accuracy of his tint reader and disputes testimony to that effect;

6

and (2) the stop was supported by reasonable suspicion and thus lawful.[1] The Court addresses these objections in turn.

### A. Deputy Tweten's Testimony

Defendant objects to Judge Roberts' factual finding that Deputy Tweten was concerned about the accuracy of his tint reader and disputes Deputy Tweten's testimony to that extent. (Doc. 34, at 1). Defendant asserts the incident report makes no mention of any concern Deputy Tweten had relating to the accuracy of his reader; rather his report states he asked Deputy Walderbach to use his own tint reader to see whether the results of the two readings were "consistent," which does not necessitate an accuracy concern. (*Id.*, at 1-2).

Defendant is correct that the report states Deputy Tweten asked Deputy Walderbach to test the tint to "see if [the readings] were consistent," and also that Deputy Tweten testified he had concerns about the accuracy of the tint reading (Docs. 26, at 2; 33, at 12-13). Just because Deputy Tweten did not explicitly write he believed his tint reader could be inaccurate does not mean that is not the reason he asked for a second reading. One logical inference flowing from his desire to see whether the two readings were consistent is that he did not know whether the first reading was accurate, particularly in view of the fact he believed the tint allowed less light to permeate than the measurement revealed. It was reasonable for Judge Roberts to conclude that Deputy Tweten's testimony, combined with his request for a separate reading by Deputy Walderbach, meant that Deputy Tweten had concerns about the accuracy of his tint reading. The Court reaches the same conclusion upon de novo review. The Court will not so quickly doubt Deputy Tweten's testimony when nothing in the record contradicts his explanation for

---

[1] Defendant also noted a typographical error in the findings of fact. The Court agrees with defendant that the statement "if the tinting was legal, he would receive a warning" should say "illegal" and has altered the recitation of facts to so reflect.

7

requesting an additional reading. Also, whether Deputy Tweten requested a second reading for consistency to gauge accuracy is immaterial to the larger question of whether the mistake of fact was reasonable—the readings themselves are material to that question. Thus, the Court finds the factual finding accurate.

Accordingly, defendant's objection is **overruled**.

### B. *Reasonable Suspicion for the Initial Stop*

For the following reasons, the Court overrules defendant's objections as to the initial stop.

In the R&R, Judge Roberts found the evidence supported Deputy Tweten had a reasonable suspicion defendant committed a traffic violation by having illegally tinted car windows, even though they were later found to bear a legal tint. (Doc. 32, 18-20). Judge Roberts dismissed defendant's argument that Deputy Tweten's reason for the stop was pretextual, noting that Deputy Tweten's body camera footage shows a visible tint to the windows. (*Id.*, at 19).

Defendant objects to Judge Roberts' legal conclusion that Deputy Tweten had reasonable suspicion to make the initial stop and asserts the stop was unlawful. (Doc. 34, at 2-3). Specifically, defendant asserts the following facts in combination show Deputy Tweten lacked any objectively reasonable suspicion to stop defendant: (1) his windows bore a legal tint—72 to 76 percent light transmittance—and that they allowed for visibility into the vehicle as shown by Deputy Tweten's statements that he could see defendant leaned back in the vehicle and may have seen defendant's hands or arms on the steering wheel; (2) Deputy Tweten's body camera footage and defendant's photographs of his vehicle show the interior of the vehicle is visible through the window; and (3) Deputy Tweten had less than a year of experience as a certified law enforcement officer at the time of the stop and had no specific training on use of tint readers nor much experience estimating vehicle window tint. (Doc. 34, at 2-3).

8

A traffic stop constitutes a seizure for purposes of the Fourth Amendment, and therefore must be supported by probable cause or reasonable, articulable suspicion that criminal activity has occurred or is occurring. *United States v. Hollins*, 685 F.3d 703, 705–06 (8th Cir. 2012); *United States v. Cox*, 992 F.3d 706, 709 (8th Cir. 2021); *United States v. Fuehrer*, 844 F.3d 767, 772 (8th Cir. 2016); *United States v. Sallis*, 507 F.3d 646, 649 (8th Cir. 2007). "Reasonable suspicion is a less demanding standard than probable cause[.]" *Alabama v. White*, 496 U.S. 325, 330 (1990).

Probable cause is present when "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Shackleford*, 830 F.3d 751, 753 (8th Cir. 2016) (cleaned up). "A[n] officer has probable cause . . . when the facts available to him would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." *Florida v. Harris*, 568 U.S. 237, 243 (2012) (cleaned up). "[T]he mere probability or substantial chance of criminal activity, rather than an actual showing of criminal activity, is all that is required." *United States v. Winarseke*, 715 F.3d 1063, 1067 (8th Cir. 2013) (internal citation and quotations omitted).

In contrast, reasonable suspicion requires that an officer be "aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." *Hollins*, 685 F.3d at 705 (citation and internal quotation marks omitted). Further, reasonable suspicion may exist when based on a mistake of fact. *United States v. Smart*, 393 F.3d 767, 770 (8th Cir. 2005). A mistake of fact must be objectively reasonable to justify a stop as lawful. *Id.*; *United States v. Williams*, 929 F.3d 539, 544 (8th Cir. 2019).

Whether under the probable-cause standard or reasonable-suspicion standard, an officer's subjective intentions play no part in the analysis. *Whren v. United States*, 517 U.S. 806, 813 (1996).

9

Defendant's objection is unavailing. Deputy Tweten had reasonable, articulable suspicion to stop defendant for a perceived violation of the Iowa Administrative Code pertaining to vehicle window tint. IOWA ADMIN. CODE. r.761-450.7 (2022). Defendant urges the Court that it was not objectively reasonable for Deputy Tweten to believe there was a tint violation because the window was not "excessively dark or reflective so that it is difficult for a person outside the motor vehicle to see into the motor vehicle." IOWA CODE § 321.438(2). Deputy Tweten testified that although he had only 10 months experience when the relevant stop occurred, he had pulled over 15-20 vehicles for illegal window tint and had not been wrong before this incident. (Doc. 33, at 6, 14-15). Deputy Tweten testified, and his report is consistent, that he observed defendant's vehicle pass him traveling southbound on his righthand side as he faced west on Highway 218. (Doc. *Id.*, at 32). He also testified he had less than 10-15 seconds to view the moving vehicle from a distance while sitting in his parked vehicle. (*Id.*, at 20). Though Deputy Tweten was able to view a driver in the vehicle, he could not see the driver's features such as apparent gender or race, only that defendant was reclined behind the B-pillar of his vehicle. Thus, Deputy Tweten reasonably believed the tint permitted less than 70 percent light transmission, which could only be confirmed or proven incorrect upon a tint reading after pulling defendant over. *See United States v. Moody*, 240 F. App'x 858, 859 (11th Cir. 2007) (finding reasonable belief existed when officer stopped vehicle for perceived window tint violation based on officer experience and inability to make out front passenger's features); *United States v. Payne*, 534 F.3d 970, 973 (8th Cir. 2008) (finding mistake of fact objectively reasonable based on difficulty discerning by sight whether traffic infraction occurred). These objective, particularized facts taken together result in reasonable suspicion to make the initial stop and check the tint.

Further, though Deputy Tweten was factually mistaken as to the window tint's legality, the stop was not unlawful because the mistake of fact was reasonable. *Id.* at 859

10

("We have indicated that a stop may be valid, even if it was based on an officer's mistake of fact, as long as the mistake was reasonable."). The body camera footage confirms defendant's windows have an apparent tint, the degree of which would be much less apparent at a distance where Deputy Tweten would have viewed it than from the distance defendant's witness, Tina Debban, photographed. Having believed the tint darker, upon taking a tint reading resulting in 75-76% transmission, Deputy Tweten had another deputy take a reading. That deputy, Deputy Walderbach, testified that when the reading came back at 72-73% transmission that he was surprised because when he "looked from the outside into the vehicle . . . [he] thought it was going to be darker than what it was." (Doc. 33, at 41). Deputy Tweten's mistake was somewhere between 2-6 percent incorrect—a reasonable mistake based on the margin of error. *See United States v. Ochoa*, 539 F. Supp. 3d 504, 513 (E.D.N.C. 2021) ("The more closely that behavior— while legal—approximates illegal behavior, the more reasonable suspicion regarding and investigation of that behavior by law enforcement becomes. . . . Indeed, if there is such a thing as a reasonable mistake regarding whether a window is illegally tinted, a 2% error must fall within the bounds of reasonableness."). Though Deputy Tweten's belief was not perfect or even correct, given the information he had at the time, his mistake of fact was reasonable so as to support a finding of reasonable suspicion and thus that the search was lawful.

Accordingly, defendant's objection is **overruled**.

### C. *Alternative Holding*

Neither party has objected to Judge Roberts' alternative legal conclusion that if the *Terry* stop were unlawful, the evidence and fruits obtained from that search would be suppressed because the new offense would not justify the vehicle search. The Court has done its own research and examination of this matter and agrees with Judge Roberts' findings and conclusions on this matter. Once defendant was out of reach and detained

for interference with official acts, there was nothing within the deputies' observations that would have provided a reasonable basis to conclude that evidence of the interference would be found in defendant's vehicle when as here the deputies had defendant's personal information. *United States v. Allen*, 713 F.3d 382, 387 (8th Cir. 2013) (quoting *United States v. Tinsley*, 365 F. App'x 709, 711 (8th Cir. 2010) (per curiam)) ("Even after an arrestee has been secured in the back of a police car, officers may search the vehicle incident to an arrest if their observations provide a 'reasonable basis' to conclude that evidence of the crime of arrest 'might be found in the vehicle.'"). *But see United States v. Feye*, 568 F. Supp. 3d 962, 978 (N.D. Iowa 2021) (finding valid warrantless search of vehicle after interference with official acts based on false name when officers did not have defendant's identification documents and believed them in the vehicle). But because the Court found the initial stop lawful, it will not suppress the evidence or fruits from the search of defendant's vehicle.

## V. CONCLUSION

For these reasons, defendant's objections are **overruled**, Judge Roberts' R&R (Doc. 32) is **adopted**, and defendant's Motion to Suppress (Doc. 25) is **denied**.

**IT IS SO ORDERED** this 9th day of August, 2023.

_____
C.J. Williams
United States District Judge
Northern District of Iowa